RICHARD R. NYGREN, APPELLANT, V.
CHERYL A. NYGREN, APPELLEE.

704 N.W.2d 257

Filed September 20, 2005.    No. A-03-1042.

Benjamin M. Belmont and Anthony W. Liakos, Senior Certified Law Student, of Brodkey, Cuddigan, Peebles & Belmont, L.L.P., for appellant.

Frank X. Haverkamp, of Penke & Haverkamp, for appellee.

CARLSON, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

Richard R. Nygren appeals the decree of the Douglas County District Court dissolving his marriage to Cheryl A. Nygren and dividing the parties' property. On appeal, he essentially argues that the trial court erred in classifying certain items and assets as marital property and in dividing the marital estate. We hold that the trial court incorrectly applied the rule from *Gerard-Ley v. Ley*, 5 Neb. App. 229, 558 N.W.2d 63 (1996), that was specifically disapproved in *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003), prior to the trial court's decision. We also hold that the trial court abused its discretion in characterizing some of Richard's nonmarital property as marital property, and we affirm as modified.

## BACKGROUND

On November 22, 1991, Richard and Cheryl entered into an antenuptial agreement. It provided that the farm owned by

Richard and the insurance agency owned by Cheryl, along with all other assets owned by the parties at that time, would remain their separate property. Additionally, any income derived from any businesses or assets held by the parties at that time would remain their separate property. Richard and Cheryl provided disclosures of their assets and liabilities as of the date of the antenuptial agreement and attached them to the agreement.

The parties married on November 23, 1991. No children were born to the marriage. Richard had farmed since 1960 on a farm that, as of the time of trial, had been in his family for over 100 years. In 1964, Richard had acquired 40 acres, and then had inherited an additional 40 acres in 1991 (we will refer to these parcels below as the 80-acre property). Richard denied ever gifting or transferring the farm to Cheryl. From the time of their marriage until December 1995, the parties lived on the family farm. At the time of trial, Richard had been employed full time as a truckdriver since 1997 or 1998 and farmed part time. Cheryl had been an agent with an insurance company since 1985. She also possessed a real estate license. During the marriage, Richard and Cheryl maintained separate bank accounts, although Cheryl testified that they had one joint account to which they both contributed for living expenses, such as groceries and entertainment.

On March 12, 1992, Richard obtained a loan from Wahoo State Bank, secured by a deed of trust on the 80-acre property, for approximately $120,000. Cheryl signed the deed of trust, but did not sign the note. Richard used the loan to pay his first wife the final payment pursuant to their divorce decree and to reduce his operating debts at Bank of Mead.

On July 19, 1994, Cheryl made Richard's annual loan payment at Wahoo State Bank in the amount of $14,459.29, from funds generated by her insurance agency. Cheryl presented evidence that $13,629.62 of her contribution went toward interest on the loan, while the remainder went toward debt reduction. Cheryl testified that Richard had asked her to lend him the money, having tried but failed to obtain it elsewhere. She stated that Richard was worried because the loan was in default and that he told her that he feared he would lose the family farm without her help. Cheryl testified that the loan was in danger of foreclosure and that she knew this because the payment was over 3 months overdue and

the bank had called. Based on information from the bank showing that only a slight portion of the principal had been paid, it was Cheryl's understanding that the secured debt on Richard's land still totaled all or nearly all of the value of the land, as it had when they married.

Cheryl suspected that Richard was unable to obtain money elsewhere because of his bad credit. Cheryl testified that many creditors called repeatedly and often. Richard testified that he had been involved in a co-op since 1960, but according to Cheryl, the co-op had refused to bring propane in 1994 "because there was no money." Credit card companies called, "[t]he phone was shutting off," and the local electric utility "was threatening to shut down the power." As of July 1994, Richard still had an outstanding loan at Bank of Mead. Cheryl testified that the loan was always in default. Richard denied ever receiving a notice of default regarding nonpayment at Wahoo State Bank or Bank of Mead.

In July or August 1994, the antenuptial agreement was destroyed by mutual agreement of the parties. The trial court received into evidence a letter, dated August 18, 1994, from the attorney who prepared the antenuptial agreement confirming their intent to destroy it. According to Cheryl, when Richard asked her to help him pay his debt at Wahoo State Bank, she told him that she would not loan him money because of his history with loans. Instead, she offered to "invest in our future together." Cheryl offered to give Richard the money if they destroyed the antenuptial agreement, and they agreed that it was the best thing to do. Richard testified that he considered Cheryl's payments toward his debt to be loans. Cheryl testified that when she and Richard decided to destroy the antenuptial agreement, it was her intention to commingle all of the property that each of them had brought into the marriage and make it marital property, and Cheryl stated that Richard told her that he had the same intention. Richard denied indicating to Cheryl before or after the antenuptial agreement was destroyed that she would have an interest in his farm while he was alive, and he did not recall agreeing to give Cheryl an interest in the farm in return for the payments she made.

On September 26, 1994, Richard executed a new will. According to Cheryl, Richard executed the will to protect her.

Richard's original will had stated that upon his death, Cheryl would have the opportunity to stay in their house and use the income from the farm as long as she did not remarry. Cheryl testified that when they destroyed the antenuptial agreement, however, the provisions of the original will still gave Richard's children standing to inherit the farm completely. Cheryl testified that Richard therefore executed the new will, which provided, in part:

> **DISTRIBUTION OF FARM:** My beloved wife, Cheryl . . . has contributed to reducing the debt on my farm, and has otherwise contributed to my farm. In consideration of this, as well as my love and devotion to her, if she shall survive me, I give, devise and bequeath to her a one-half interest in my farm, to include the land and all appurtenances thereon, subject to the right and obligation of my children to purchase her interest within eighteen months of the date of my death. Should Cheryl and I die simultaneously under the terms of this will, my personal representative, if sufficient assets are available, or the distributees of my farm shall pay Cheryl's children all sums which she contributed to the farm, plus interest at the rate of seven percent thereon from the date of advancement until paid.

Richard explained that the reference to "my farm" meant the 80-acre property. Cheryl stated that in June 1999, Richard reviewed the will and approved it. According to Richard, the will was no longer in existence at the time of trial.

On March 1, 1995, Cheryl paid $7,500 from her business account to Wahoo State Bank toward Richard's annual loan payment, and Richard paid the remaining sum to complete that payment. Cheryl testified that Richard had told her that his crops and the price of hogs "were not good" and that he needed more help. According to Cheryl, Richard again expressed fear that he would lose the family farm without her help.

Cheryl admitted that part of the approximately $22,000 that she put toward the loan payments at Wahoo State Bank came from funds that she had prior to the marriage, though not more than $5,200, which was an estimate of the total amount in Cheryl's checking and savings accounts when she signed the antenuptial agreement. The remainder came from funds she had earned between 1991 and 1995. Cheryl did not recall how much

money was in her savings account when she made the 1995 payment.

Cheryl testified that when she first moved to the parties' farmhouse, the "interior was in bad shape." Cheryl, her brothers, her parents, and her sons made substantial repairs and modifications, including gutting and modernizing an existing bathroom, adding a new bathroom, joining two rooms to make a large bedroom, installing closets, replacing floor coverings, replacing ceilings, and painting inside and outside. Richard admitted that Cheryl did some "decorating" and that her father and brothers "took a wall out" and helped install a new bathroom. According to Richard, it was "debatable" whether such improvements added to the value of the house. Richard denied that Cheryl ever worked on the farm or made any improvements to it during the 4 years they lived there.

On December 26, 1995, Richard sold the house and the 3 acres upon which it stood—part of the aforementioned 80-acre property—to his daughter and son-in-law for approximately $85,000. Richard testified that the 3 acres did not include farmland or buildings other than the house. Cheryl opined, as a real estate agent, that when she and Richard married, the house and the surrounding 3 acres were worth approximately $55,000. Cheryl testified that she could not accurately estimate how much the house increased in value from the time the parties married until the house was sold, but she stated, "I'm sure we had to improve the value with that complete renovation . . . ." On cross-examination, Cheryl admitted that she was not an appraiser and that any values she mentioned in the context of improvements constituted speculation. At the time of sale, the farmhouse and 3 acres were appraised at $106,000.

Richard used $23,949.54 from the sale of the farmhouse and the 3 acres for a downpayment on a house in a southwest subdivision of Omaha, in which house Richard and Cheryl took title as joint tenants. Richard testified that he made the downpayment on that house essentially to repay Cheryl for making the loan payments to Wahoo State Bank in 1994 and 1995. On August 15, 1996, the parties sold that house and purchased another house in southwest Omaha. Cheryl alone was listed on the title for the latter house. On August 31, 1999, the parties sold the latter house,

and they purchased a duplex in northeast Omaha which was likewise titled in Cheryl's name alone and where she lived at the time of trial.

On March 14, 2002, Richard informed Cheryl that he had agreed to sell 37 of the originally 80-acre property's remaining 77 acres to his four children for $80,000, or $2,162.16 per acre. Cheryl testified on direct examination that she was concerned, in part about the parties' retirement prospects, because she believed the 37 acres to be worth more than $80,000. She then testified about her opinion concerning the per-acre value of the land:

> [Cheryl's counsel:] Do you have an opinion as to the value of farmland of that type in that area?
>
> [Cheryl:] I can only state what I know the bank has told me, and —
>
> [Richard's counsel]: Judge, I'm going to object on foundation and hearsay.
>
> THE COURT: Overruled. Go ahead.
>
> [Cheryl:] Yes, sir, I do. I know what I've been told [t]hat it's worth.
>
> [Richard's counsel]: Judge, objection, hearsay and foundation.
>
> THE COURT: Overruled. Go ahead, ma'am.
>
> [Cheryl:] One banker told me $3,200 and one said [$3,400]. And then I had an appraiser that I've talked to that said it could run anywhere from [$2,900] to — some of the land in that area sold for $3,800. So I would say mid 30s, upper 30s.

Based on these values, Cheryl believed that Richard had sold the property for at least $1,000 per acre less than what he could have obtained in an arm's-length sale. Richard testified that at the time of trial, he still had 40 acres of what had been the 80-acre property. He estimated that that land was worth $2,600 per acre.

The parties testified and exhibits were received regarding the valuation of additional assets. At the time of trial, the value of Richard's interest in the co-op he had been gaining equity in was approximately $11,467.98. Richard estimated that $2,500, or approximately 25 percent, of that amount had been accumulated during the marriage. Richard admitted that he had no documentary support for this estimate. Richard admitted spending money

at the co-op during the marriage to raise approximately 500 to 600 hogs per year and to farm approximately 500 acres. In Cheryl's valuation of the marital estate, she included the entire value of Richard's interest in the co-op, or $11,467.98.

The trial court received Cheryl's valuations of the farm equipment, which she presented as "Option A = purchased during marriage" and "Option B - All." Option A stated the following values:

| | |
|---|---|
| Skid loader | $ 1,000 |
| Combine | 12,000 |
| Corn head | 3,000 |
| Bean head | 3,000 |
| Grain bin, 3,500-bushel | 3,500 |
| Irrigation equipment | 37,500 |
| | $60,000 |

Option B totaled $169,230 and included equipment acquired both before and after the parties married, except for the skid loader, which was inexplicably omitted from option B. Cheryl testified that she based her valuations of the farm equipment on the amount of insurance carried on it. Cheryl testified that the farm equipment was insured for actual cash value and that the insurance on the farm equipment lapsed on April 11, 2002. She had written the insurance policies for the farm equipment and received commissions for them based on the premiums. She did not have the equipment appraised, "[o]ther than underwriting," but she testified that she relied on Richard's word as to the equipment's value.

Richard testified that he possessed certain items of farm equipment before the marriage and purchased more items during the marriage. Of the items purchased during the marriage, a skid loader, a combine, and two six-row combine heads were still operational at the time of trial, and Richard valued them as follows:

| | |
|---|---|
| Skid loader | $ 200 |
| Combine | 3,000 |
| Combine heads | 2,000 |
| | $5,200 |

Richard paid $335 for the skid loader, $21,800 for the combine, and $2,100 for the combine heads. Richard testified that the skid loader was approximately 10 years old and was in average to below-average condition. As indicated above, Richard valued the skid loader at $200, but he admitted at trial that he probably could not replace it for that amount. The combine and one of the heads were made in 1981, and the other head was made in 1976. Richard did not dispute that he had insured the equipment for the values set forth by Cheryl.

Richard testified that he also purchased an irrigation center pivot during the marriage, which pivot, at the time of trial, had been dismantled as scrap. As noted above, Cheryl valued Richard's irrigation equipment at $37,500 based on an insurance policy, but Richard testified that the parties' $37,500 insurance policy for irrigation equipment was for such equipment that he had purchased prior to the marriage. Also, Richard did not recall purchasing a 3,500-bushel grain bin during the marriage, which bin Cheryl asserted he had bought.

Cheryl valued her 1996 Oldsmobile at $3,292, while Richard valued it at $7,315. Cheryl testified that she based her estimation of its value on the "Blue Book" and subtracted a portion of that value for the car that she brought into the marriage, which was traded eventually to obtain the 1996 Oldsmobile. According to the antenuptial agreement, Cheryl brought a 1990 Chrysler worth $20,000 into the marriage. Another exhibit recounted the subsequent vehicle trades:

| Purchase | Vehicle | Value | Trade |
|----------|---------|-------|-------|
| September 1990 | 1990 Chrysler | (illegible) | |
| April 1995 | 1992 Oldsmobile | $20,184 | $7,435 |
| December 1998 | 1996 Oldsmobile | $22,194 | $7,995 |

Cheryl requested that the court credit her with one-half of the trade value of her premarital 1990 Chrysler as against the 1996 Oldsmobile, or approximately $3,700, and deduct it from the 1996 Oldsmobile's "Blue Book" value of $6,585.

Cheryl admitted that during the marriage, she contributed to retirement accounts. Among those accounts were four "Equitrust" accounts, totaling $32,870.98. She testified that her two "Farm

Bureau variable annuities" were created during the marriage, and she assigned them a "marital value" of $20,179.16.

Cheryl testified that she contributed to a "career incentive plan" both before and during the marriage. Statements for the career incentive plan were received into evidence. A handwritten notation, signed by Cheryl, on one statement indicates that she began her career incentive plan in 1987 and had not contributed to it since 1994. Cheryl calculated that the vested value of the plan as of April 10, 2002, was $20,306.12. She testified that she considered 35.31 percent of that value, or $7,170.09, to be a "premarital asset," while the remaining portion, or $13,136.03, was a "marital asset." Cheryl offered the following figures, which reflect how she arrived at 35.31 percent as a premarital asset:

| Date | Plan Total | Percent of 12/31/95 Value |
|---|---|---|
| 11/30/91 | $ 6,138.56 | 35.31 |
| 8/31/94 | 16,204.19 | 93.20 |
| 12/30/95 | 17,385.86 | 100.00 |

Thus, when Cheryl married in November 1991, she had already made 35.31 percent of the contributions she would make to the career incentive plan.

Cheryl submitted the following information regarding debts:

**Miscellaneous Debt**

| Overdraft protection | $1,000.00 |
|---|---|
| Accountant | 4,378.71 |
| 2001 taxes | 3,800.00 |

Cheryl testified that the accountant debt of $4,378.71 represented charges for preparation of tax returns for both her insurance agency and the farm. She requested that the trial court assess $1,500 of that debt to her and the remainder to Richard. Cheryl requested that the other miscellaneous debts be divided equally between the parties.

Cheryl testified that at the time of the parties' separation, the farm debt totaled approximately $58,000 at Wahoo State Bank and $42,000 at Bank of Mead. Thus, it was Cheryl's understanding that a total of approximately $100,000 was owed

against the land. Richard denied that Bank of Mead had a lien against his land; he stated that the Bank of Mead loans were "[u]nsecured, with the exception of the farming business, grains, [and] livestock."

The trial court found:

> [A]lthough the parties brought [premarital] assets into the marriage, which they itemized in their [antenuptial] agreement, the parties gifted those [premarital] assets to the marriage, making them marital assets to be divided by the Court. This was the testimony of [Cheryl], which the Court, having observed the testimony of both parties, finds to be more credible than [Richard's] testimony, and supported by the evidence.
>
> [Cheryl's] testimony that the parties intended to co[m]mingle their separate [premarital] assets was corroborated by the fact that both agreed to rescind their [antenuptial] agreement as confirmed by [their attorney] in his letter to the parties . . . ; [Richard's] change in his will . . . ; and [Cheryl's] being listed as a seller of 37 acres of the [80-acre property] in March, 2002 . . . .

The trial court valued the 80-acre property's remaining 40 acres at $3,000 per acre and, subtracting the debt owed on the farm at the time of the parties' separation, determined the farm's equity to be $20,000 at the time of their separation. For the remaining marital assets, the trial court relied on Cheryl's valuations as set forth in her exhibit dividing the property:

|  | Richard | Cheryl |
|---|---|---|
| Cash | $ 500.00 | $ 2,415.71 |
| Furniture | 1,865.00 | 2,770.00 |
| Automobiles | | |
| 1996 Oldsmobile | | 3,292.00 |
| 1991 Dodge | 2,185.00 | |
| 1996 Dodge | 0.00 | |
| 1987 Ford | 1,925.00 | |
| Retirement account | 896.00 | |
| Equitrust accounts | | 32,870.98 |
| Farm Bureau annuities | | 20,179.16 |
| Career incentive plan | | 13,136.03 |

| | | |
|---|---|---|
| Life insurance policies | | 6,604.00 |
| Duplex | | 16,872.00 |
| Co-op | 11,467.98 | |
| Farm equipment, buildings | 169,230.00 | |
| Farm (40 acres at $3,000/acre) | 120,000.00 | |
| Farm debt | | |
| (rounded from $99,972.27, total | | |
| owed to Wahoo and Mead banks) | (100,000.00) | |
| TOTAL | $208,068.98 | $98,139.88 |

The trial court found that Richard should be responsible for the marital debts, and it credited Cheryl for $1,500 that she contributed toward the accountant debt. To equalize the division of the marital assets, the trial court ordered Richard to pay Cheryl $53,420.

## ASSIGNMENTS OF ERROR

Richard alleges that the trial court erred in (1) including his premarital farm and premarital farm equipment in the marital estate, (2) including in the marital estate the entire value of his interest in the co-op, (3) finding that he gifted his premarital assets to the marriage, (4) dividing the marital estate as it did, (5) overruling Richard's objections to Cheryl's valuation of Richard's farm and farm equipment, (6) not including in the marital estate the entire value of Cheryl's retirement accounts and automobile, (7) ordering Richard to pay Cheryl the sum of $53,420 to equalize the division of the marital estate, and (8) requiring Richard to pay all the parties' marital debts.

## STANDARD OF REVIEW

In actions for the dissolution of marriage, the division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.*

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts over another. *Mace v. Mace*, 9 Neb. App. 270, 610 N.W.2d 436 (2000).

## ANALYSIS

*Gift of Premarital Assets.*

■ Richard contends that the evidence does not support a finding that he gifted his premarital assets, including the farmland and farm equipment, to the marital estate. We begin by recalling a basic principle: Property owned by a party at the time of marriage is not marital property. *Smith v. Smith*, 9 Neb. App. 975, 623 N.W.2d 705 (2001). Thus, unless some exception applies to change the basic rule, the farmland and farm equipment owned by Richard prior to the marriage are not marital property. Cheryl contends that by an oral agreement, at the time of the destruction of the antenuptial agreement, "both parties agreed that from that time forward, they would co[m]mingle all assets and anything owned by one, would be considered the joint property of the other." Brief for appellee at 18.

■ At the time the parties made their antenuptial agreement, public policy in Nebraska prohibited enforcement of a provision in such an agreement purporting to forfeit property rights in the event of a divorce. See *Mulford v. Mulford*, 211 Neb. 747, 320 N.W.2d 470 (1982) (generally, antenuptial agreements providing that in event of divorce or separation, each spouse should forfeit his or her rights in property of other, are contrary to public policy and void as tending to promote divorce). Thus, such agreements were enforceable only in accordance with testamentary dispositions or other transfers taking effect at death. In finding that the parties had gifted their premarital assets to the marriage, the trial court was apparently relying upon *Gerard-Ley v. Ley*, 5 Neb. App. 229, 558 N.W.2d 63 (1996), in which this court held that when a husband and wife take title to a property as joint tenants, even though one pays all the consideration therefor, a gift is presumed to be made by the spouse furnishing the consideration to the other. However, approximately 4 months before the trial court filed its decree in this case, the Nebraska Supreme Court expressly disapproved *Gerard-Ley* in *Schuman v. Schuman, supra,*

14

which held that the manner in which property is titled or transferred by the parties during a marriage does not restrict the trial court's determination of how the property will be divided in an action for dissolution of marriage. Therefore, we conclude that the trial court applied the wrong rule in determining that the parties had gifted their premarital assets to the marriage.

Although we agree with the trial court's determination that the parties agreed to revoke their antenuptial agreement, it does not follow that they also agreed to convert their sole property to jointly owned property. Had they intended to do so, the portion of Richard's will providing that Cheryl would receive a one-half interest in the farm upon Richard's death would have been superfluous, because Cheryl would have already owned a one-half interest in the farm. Thus, the will does not support the notion that the parties intended to gift their premarital interests to each other; instead, it lends support to the opposite conclusion.

*Farmland.*

Richard argues that the trial court erred in including Richard's 40 acres, remaining from the 80-acre property, in the marital estate. The equitable property division in an action for the dissolution of marriage involves three steps: "The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties . . . ." *Tyma v. Tyma*, 263 Neb. 873, 877, 644 N.W.2d 139, 144 (2002). The "marital estate" includes property accumulated and acquired during the marriage through the joint efforts of the parties. *Id.*

In dividing property inherited by or gifted to one of the parties, we look to the rule in *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 733, 325 N.W.2d 832, 834 (1982):

> [P]roperty acquired by one of the parties through gift or inheritance ordinarily is set off to the individual receiving the inheritance or gift and is not considered a part of the marital estate. . . . An exception to the rule is where both of the spouses have contributed to the improvement or operation of the property which one of the parties owned prior to the marriage or received by way of gift or inheritance, or

the spouse not owning the property prior to the marriage or not receiving the inheritance or gift has significantly cared for the property during the marriage.

Thus, the marital estate generally does not include property acquired by one of the parties through gift or inheritance. See *id.* However, an exception applies when both spouses have contributed to the improvement or operation of the property that one of them received by gift or inheritance. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997). In *Tyler*, the wife brought a home from a prior marriage into the marriage at issue. The husband and the wife lived in the wife's house, sold it, and purchased another, which became the focus of the appeal. This court modified the divorce decree to require the wife to pay the husband half of the equity in the latter home owned by the parties, but the Nebraska Supreme Court reversed, stating that each time the *Van Newkirk* exception had been applied, the Nebraska Supreme Court had "required evidence of the value of the contributions and evidence that the contributions were significant." *Tyler v. Tyler*, 253 Neb. at 213, 570 N.W.2d at 320. The court in *Tyler* then recounted evidence that the husband had improved the home by performing such tasks as building a deck, carpeting and painting the family room, replacing kitchen countertops, and installing four ceiling fans. The husband had also contributed to the mortgage, paid a special assessment lien, and submitted expenses for certain improvements to the house. The *Tyler* court observed that the husband failed to produce any evidence indicating the value of these contributions and that he failed to demonstrate "the significance of the aforementioned contributions." 253 Neb. at 214, 570 N.W.2d at 320. However, the court found that the husband was entitled to be compensated for his contributions, the special assessment lien, and half the mortgage reduction.

Because it is undisputed that Richard owned the 40 acres in question prior to the marriage, the initial issue is whether the *Van Newkirk* exception applies so that the property should be included in the marital estate. Cheryl resided on the farm for 4 years of the parties' marriage. There is no evidence that she worked in the farming operation. While Cheryl presented evidence that she and her immediate family made improvements to

the farmhouse, Richard sold that portion of the farm in 1995, and there is no evidence that any improvements Cheryl made to that portion contributed to the value of the 40 acres remaining at the time of trial. Cheryl did, however, make farm payments in 1994 and 1995 totaling $21,959.29. Cheryl testified that Richard feared he would lose the family farm without her aid. Cheryl admitted that an estimated $5,200 or less of the $21,959.29 came from her premarital funds. The remainder came from funds Cheryl had earned during the marriage. The antenuptial agreement, assuming it was ever effective, had been revoked by the parties, and any funds Cheryl earned before the marriage were her separate property, while any funds she earned during the marriage were marital property. See *Tyma v. Tyma*, 263 Neb. 873, 644 N.W.2d 139 (2002). Therefore, pursuant to *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982), and *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997), we conclude that Cheryl's contributions of not more than $5,200 from her separate property were not so significant as to garner Cheryl an interest in Richard's farm.

Although we conclude that Cheryl never acquired an interest in the farm, the revocation of the antenuptial agreement did operate to allow Cheryl to acquire an interest in the contributions she made to the Wahoo State Bank loan—whether from premarital or marital funds. Therefore, Cheryl is entitled to be compensated in full for her contributions from premarital funds and to receive one-half of the remainder, which came from marital funds. However, Cheryl did not present evidence of the value of her premarital contribution. She testified that she contributed not more than $5,200 in premarital funds, that amount being an estimate of her assets at the time she signed the prenuptial agreement. We consider this estimate upon an estimate to be insufficient evidence of the value of Cheryl's contribution from premarital funds, and we therefore consider her entire contribution of $21,959.29 to be from marital funds and conclude that she is entitled to compensation for half of that sum, or $10,979.65.

■ Cheryl contends that if she is to receive credit for her contribution to the farm payments, that credit should include interest at the rate of 7 percent. Cheryl bases this rate of interest on

Richard's will, which provided: "[T]he distributees of my farm shall pay Cheryl's children all sums which she contributed to the farm, plus interest at the rate of seven percent thereon from the date of advancement until paid." We decline to allow Cheryl such interest. The will was not in effect at the time of trial, see *Tucker v. Heirs of Myers*, 151 Neb. 359, 37 N.W.2d 585 (1949) (provisions of will take effect and become operative at time of testator's death), and this provision was intended to operate upon the simultaneous death of both Richard and Cheryl. That event has not occurred, and the will cannot serve as justification for the award of interest that Cheryl seeks.

Richard also contends that the trial court erred in overruling his objections to Cheryl's valuations of his remaining 40 acres. When asked whether she had an opinion as to the value of the land, Cheryl testified that bankers had told her $3,200 per acre and $3,400 per acre. Based on this input and a discussion with an appraiser, Cheryl opined, "mid-30s, upper 30s." Richard objected based on hearsay and foundational grounds, and he restates those grounds on appeal, arguing that Cheryl had never been the owner of the land.

*First Baptist Church v. State*, 178 Neb. 831, 834-35, 135 N.W.2d 756, 758-59 (1965), sets forth the general rule for lay witnesses without ownership testifying about the value of land:

> "It is the general rule that a witness need not be an expert to testify to the value of land. Market value is not a question of science or skill upon which experts alone may give an opinion. . . . It is necessary only to show that he has the means of forming an intelligent opinion derived from an adequate knowledge of the nature and kind of property in controversy, and of its value. . . . It is not essential that every witness expressing an opinion shall have all-inclusive information of every detail of the elements entering into the value. . . . It is most difficult to state an all-inclusive rule fixing the qualification of witnesses to give their opinions as to the market value of land. Their testimony is ordinarily received if they show an acquaintance with the property and are informed as to the state of the market, the weight and credibility of their evidence being for the jury. . . ."

(Citations omitted.) (Emphasis omitted.) Quoting *Evans v. State*, 176 Neb. 156, 125 N.W.2d 541 (1963).

Although Cheryl did not possess an ownership interest in the family farm, she lived on it for 4 years, and she had worked as a licensed real estate agent. She testified that she had spoken to bankers and appraisers regarding the value of the land. Their statements were not offered for the truth of the matter asserted, but, rather, to show that Cheryl had researched the value of the land. It was upon this research that Cheryl based her opinion of the value of the land. Thus, we conclude that Cheryl demonstrated an acquaintance with the land and the state of the market and that the trial court did not err in allowing her opinion as to the value of the land, over Richard's objections.

*Farm Equipment.*

Richard contends that the trial court erred in overruling his objections to Cheryl's valuations of the farm equipment despite insufficient foundation and in relying on those valuations. Cheryl testified that Richard's farm equipment was insured for cash value and that she relied on the figures in the insurance policies in determining the value of the equipment. She admitted that she wrote the policies, but she also testified that she relied on Richard's word in assigning values to the equipment and that the values were approved by underwriters. Richard's values for the farm equipment conflicted with Cheryl's. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts over another. *Mace v. Mace*, 9 Neb. App. 270, 610 N.W.2d 436 (2000). We conclude that Cheryl established sufficient foundation for her valuations of the farm equipment and that the trial court did not abuse its discretion in using those valuations in its calculations of the marital estate.

Richard asserts that the trial court erred in relying on Cheryl's exhibit which included in the marital estate farm equipment acquired both before and during the marriage. We agree. The trial court included $169,230 for farm equipment in the marital estate, despite the fact that Cheryl clearly admitted that the figure included equipment that Richard had acquired prior to the marriage. See *Tyma v. Tyma*, 263 Neb. 873, 644 N.W.2d 139 (2002)

(marital estate includes property accumulated and acquired during marriage through joint efforts of parties).

It is undisputed that Richard obtained the skid loader, the combine, and the combine heads during the marriage. However, Richard argues that the trial court erred in including irrigation equipment and a grain bin in the marital estate. Cheryl presented evidence that Richard acquired irrigation equipment and a 3,500-bushel grain bin during the marriage, which she valued at $37,500 and $3,500, respectively. Richard testified that the irrigation equipment to which Cheryl referred had been acquired prior to the marriage, while the irrigation equipment he had acquired during the marriage had been dismantled and had only scrap value. He also testified that he acquired the grain bin prior to the marriage. We again note that when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts over another, and on our de novo review, we conclude that the trial court did not abuse its discretion in including the irrigation equipment and the grain bin in the marital estate. See *Mace v. Mace, supra.*

On our de novo review, we determine that the skid loader, the combine, the combine heads, the grain bin, and the irrigation equipment were properly valued and included in the marital estate, but that the trial court abused its discretion in including any farm equipment obtained prior to the marriage. We set forth our changes to the overall division of property below.

*Richard's Interest in Co-op.*

Richard argues that the trial court erred in including his entire interest in the co-op in the marital estate. He points out that he had been involved in the co-op for 40 years, during only 10 of which he was married to Cheryl. Of Richard's $11,467.98 interest in the co-op at the time of trial, Richard estimated that he had accumulated $2,500, or approximately 25 percent, during the marriage. Richard did not support this testimony with co-op statements or other documentation, and considering the size of his farming operation during the marriage, it is certainly possible that he contributed more than $2,500 during that period. Moreover, Richard's calculation assumes that he acquired the

interest at a constant rate for 40 years. In Cheryl's calculations, she included the entire value of Richard's interest in the co-op in the marital estate; however, taking into account that Cheryl considered even premarital assets to be part of the marital estate after the revocation of the antenuptial agreement, she may have included Richard's premarital interest in the co-op in her division of the marital estate or she may have assumed that Richard acquired his entire interest in the co-op during the marriage.

The burden of proof to show that property is a nonmarital asset remains with the person making the claim. *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001). Where several inferences may be drawn from the facts proved, which inferences are opposed to each other but are equally consistent with the facts proved, the party having the burden of proof may not sustain that burden by a reliance alone on the inference supporting that party's position. See *Fritz v. Marten*, 193 Neb. 83, 225 N.W.2d 418 (1975). The inference that the equity in the co-op accrued at a constant rate over the 40-year period is no stronger than an inference that a greater portion accrued during the marital period. We conclude that Richard did not meet his burden and that the trial court did not abuse its discretion in including in the marital estate the entire value of Richard's interest in the co-op.

*Cheryl's Retirement Accounts.*

Richard asserts that the trial court allowed Cheryl to arbitrarily reduce the value of one of her Farm Bureau annuities. He contests Cheryl's reduction of the value of that account, a reduction representing significant contributions she made after the parties' separation. Although Neb. Rev. Stat. § 42-366(8) (Reissue 2004) requires that any pension plans, retirement plans, annuities, and other deferred compensation benefits owned by either party be included as part of the marital estate, the plain language of the statute does not require that such assets be valued at the time of dissolution; the expression "at the time of dissolution" in § 42-366(8) qualifies the date at which the marital estate is divided but does not provide that pension-type property must be valued on such date. *Hosack v. Hosack*, 267 Neb. 934, 678

N.W.2d 746 (2004). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Tyma v. Tyma*, 263 Neb. 873, 644 N.W.2d 139 (2002). Based on this authority, we conclude that the trial court was reasonable and did not abuse its discretion in allowing Cheryl to subtract her postseparation contributions from the value of her annuity. She and Richard were no longer supporting each other at that time, and Cheryl logically accounted for the amount of those contributions.

Richard also argues that the trial court allowed Cheryl to arbitrarily reduce the value of her career incentive plan to offset her premarital contributions to it. We disagree. Cheryl's calculations, set forth above, support her deduction of 35.31 percent to arrive at the value of the marital portion of the plan.

*Cheryl's 1996 Oldsmobile.*

Richard asserts that Cheryl arbitrarily reduced the value of her 1996 Oldsmobile, which was purchased during the marriage. Despite the convoluted arithmetic presented by Cheryl in her testimony, it is apparent that she requested and received approximately one-half the "Blue Book" value of her 1996 Oldsmobile because that vehicle had been obtained, in part, through trade-in value traceable to her nonmarital vehicle. On our de novo review, we conclude that the value of the 1996 Oldsmobile was not arbitrarily reduced and that the trial court did not abuse its discretion in assigning a marital value to that vehicle.

*Omaha Residences.*

We note that Cheryl argues that the parties' first house in Omaha constitutes a marital asset because it was titled in joint tenancy. As Richard correctly points out in his reply brief, in *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003), the Nebraska Supreme Court expressly disapproved an interpretation of *Gerard-Ley v. Ley*, 5 Neb. App. 229, 558 N.W.2d 63 (1996), which would preclude nonmarital property titled in joint tenancy during the marriage from being considered as a nonmarital asset in an action for dissolution of marriage simply because the property was so titled. However, at no time does Richard argue or assign that the trial court erred in including the net value

of the duplex, which was eventually purchased from the proceeds of the sale of the first Omaha house, in the marital estate. Therefore, we need not consider the classification of these houses further. See *Schnell v. Schnell*, 12 Neb. App. 321, 673 N.W.2d 578 (2003) (alleged errors must be specifically assigned and specifically argued in order to be considered by appellate court).

*Marital Debts.*

Richard assigns that the trial court erred in requiring him to pay all the parties' marital debts. However, he did not argue that error in his brief, and we will not consider it. See *id.*

*Division of Property and Credits.*

Based on the foregoing analysis, we divide the parties' marital estate as follows:

|  | Richard | Cheryl |
|---|---|---|
| Cash | $ 500.00 | $ 2,415.71 |
| Furniture | 1,865.00 | 2,770.00 |
| Automobiles |  |  |
| 1996 Oldsmobile |  | 3,292.00 |
| 1991 Dodge | 2,185.00 |  |
| 1996 Dodge | 0.00 |  |
| 1987 Ford | 1,925.00 |  |
| Retirement account | 896.00 |  |
| Equitrust accounts |  | 32,870.98 |
| Farm Bureau annuities |  | 20,179.16 |
| Career incentive plan |  | 13,136.03 |
| Life insurance policies |  | 6,604.00 |
| Duplex |  | 16,872.00 |
| Co-op | 11,467.98 |  |
| Farm equipment |  |  |
| Skid loader | 1,000.00 |  |
| Combine | 12,000.00 |  |
| Corn head | 3,000.00 |  |
| Bean head | 3,000.00 |  |
| Grain bin | 3,500.00 |  |
| Irrigation equipment | 37,500.00 |  |
| TOTAL | $78,838.98 | $98,139.88 |

To equalize the marital estate, we conclude that Cheryl owes Richard $9,650.45, or one-half the difference between $78,838.98 and $98,139.88. However, as discussed above, Richard must compensate Cheryl, in the amount of $10,979.65, for her contributions to the farm loan. On appeal, Richard did not contest the $1,500 credit Cheryl received for payments she made for tax preparation; therefore, she is entitled to that credit as well. Considering together the $9,650.45 owed to Richard for equalization of the marital estate and the $12,479.65 in credits owed to Cheryl, we conclude that Richard shall pay Cheryl the difference between those two figures: $2,829.20.

## CONCLUSION

On our de novo review, we hold that the trial court applied an incorrect standard in determining the marital estate, that the trial court abused its discretion in including some of Richard's farm equipment in the marital estate, and that Cheryl should receive compensation for contributions she made to the farm debt. Therefore, we affirm the trial court's decree, as modified.

AFFIRMED AS MODIFIED.