Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/16/2016 09:13 AM CDT

Amy Marshall, appellee, v.
Brian W. Marshall, appellant.
___ N.W.2d ___

Filed August 16, 2016.    No. A-15-035.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Appeal and Error.** An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial court. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, and alimony.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Property Division.** The equitable division of marital property is a three-step process: The first step is to classify the parties' property as marital or nonmarital, the second step is to value the marital assets and marital liabilities of the parties, and the third step is to calculate and divide the net marital estate between the parties in accordance with statutory principles.

4. ____. The marital estate includes property accumulated and acquired during the marriage through the joint efforts of the parties.

5. **Divorce: Property Division.** Compensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of postdivorce earning capacity should not equitably be included in the marital estate.

6. **Property Division.** Compensation for past wages, medical expenses, and other items that compensate for the diminution of the marital estate should equitably be included in the marital estate as they properly replace losses of property created by the marital partnership.

7. **Property Division: Proof.** The burden of proof to show that property is nonmarital remains with the person making the claim.

8. **Property Division: Proof: Workers' Compensation: Presumptions.**
Where the party making the claim of nonmarital property fails to prove
that all or portions of an injury compensation are for purely personal
losses or loss of future earning capacity, the presumption remains that
the proceeds from the personal injury or workers' compensation settle-
ment or award are marital property.

9. **Evidence: Appeal and Error.** When evidence is in conflict, an appel-
late court considers, and may give weight to, the fact that the trial judge
heard and observed the witnesses and accepted one version of the facts
rather than another.

10. **Child Support.** The provision of in-kind benefits, from an employer
or other third party, may be included in a party's income for child sup-
port purposes.

11. **Trial: Evidence: Appeal and Error.** Erroneous admission of evidence
is harmless error and does not require reversal if the evidence is cumula-
tive and other relevant evidence, properly admitted, supports the finding
by the trier of fact.

12. **Alimony.** In awarding alimony, a court should consider, in addition to
the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2008),
the income and earning capacity of each party as well as the general
equities of each situation.

13. ____. Disparity in income or potential income may partially justify an
award of alimony.

Appeal from the District Court for Douglas County: Thomas
A. Otepka, Judge. Affirmed in part, and in part reversed and
remanded with directions.

Donald A. Roberts and Justin A. Roberts, of Lustgarten &
Roberts, P.C., L.L.O., for appellant.

Anthony W. Liakos, of Govier & Milone, L.L.P., for
appellee.

Moore, Chief Judge, and Irwin and Bishop, Judges.

Irwin, Judge.

## I. INTRODUCTION

Brian W. Marshall appeals from a decree of dissolution
entered by the district court, which decree dissolved Brian's
marriage to Amy Marshall; divided the marital assets and

debts; awarded Amy sole physical custody of the parties' minor child; and ordered Brian to pay child support, alimony, and a portion of Amy's attorney fees. On appeal, Brian asserts that the district court erred in calculating and dividing the marital estate, in calculating his income for child support purposes, in admitting into evidence certain documentation about personal injury settlement proceeds received by the parties during the marriage, and in awarding Amy alimony in the amount of $2,000 per month for 21 years.

Upon our de novo review of the record, we find that the district court erred in failing to include all of the proceeds from the personal injury settlement in the marital estate and in calculating Brian's current income. As a result of these errors, we remand the matter to the district court to recalculate the value of the parties' marital estate, redistribute the assets and debts between the parties, and recalculate Brian's child support obligation. In addition, we reverse the district court's determination concerning Amy's alimony award, because the court should reconsider this award in light of any changes to the marital estate and to the calculation of Brian's child support.

## II. BACKGROUND

Brian and Amy were married on August 20, 1993. Two children were born of the marriage; however, by the time of the dissolution proceedings, only one child remained a minor, the parties' daughter, born in August 1996.

On February 8, 2013, Amy filed a complaint for dissolution of marriage. In the complaint, Amy specifically asked that the parties' marriage be dissolved; that their marital assets and debts be equitably divided; that she be awarded custody of the parties' daughter; and that she be awarded child support, alimony, and attorney fees.

On March 4, 2013, Brian filed an answer and cross-complaint for dissolution of marriage. In his cross-complaint, he asked that he be awarded custody of the parties' daughter, child support, and attorney fees.

On March 21, 2013, the district court entered a temporary order awarding Amy sole physical custody of the parties' daughter and awarding Brian and Amy joint legal custody of her pending a trial. Brian was ordered to pay temporary child support in the amount of $514 per month. In addition, he was ordered to maintain health insurance for the family and to pay the real estate taxes for the marital home.

Trial was held in October 2014. At trial, both Brian and Amy agreed that they would continue to share legal custody of their daughter and that Amy would retain sole physical custody. As a result of this agreement, the issues left to be resolved at trial included division of the parties' assets and debts, child support, alimony, and attorney fees. The parties' trial testimony centered on their current financial circumstances. In particular, a great deal of testimony focused on the disabling effects of a stroke Amy suffered in 2003 and a personal injury settlement that Brian and Amy received as a result of Amy's stroke. More specific details about this testimony will be discussed as necessary in our analysis below.

After the trial, the district court entered a decree of dissolution. In the decree, the court ordered Brian to pay $935 per month in child support. In addition, the court ordered Brian to pay Amy alimony in the amount of $2,000 per month for 21 years and $5,000 of her attorney fees. The court calculated and divided the marital estate such that Amy received the marital home and her personal vehicle and Brian received a rental home owned by the parties; two trucks and two boats; his interest in a business referred to as "Elite Fitness"; and his 49-percent interest in his family's business, Marshall Enterprises. The court divided equally the cash value of various life insurance policies held by Brian. The court also set aside a portion of the personal injury settlement from Amy's stroke as Amy's nonmarital property and set aside a smaller portion of that settlement as Brian's nonmarital property.

Brian appeals from the decree of dissolution here.

## III. ASSIGNMENTS OF ERROR

On appeal, Brian assigns four errors: He asserts, restated, that the district court erred in calculating and dividing the marital estate; in calculating his income for child support purposes; in admitting into evidence exhibit 81, which contained documents relating to the settlement proceeds Brian and Amy received as a result of Amy's stroke; and in awarding Amy alimony in the amount of $2,000 per month for 21 years.

## IV. STANDARD OF REVIEW

[1] An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial court. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, and alimony. See, *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006); *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

[2] An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005).

## V. ANALYSIS

### 1. Calculation and Division of Marital Estate

Brian first asserts that the district court abused its discretion in its calculation and division of the marital estate. Specifically, he argues that the court erred in setting aside any portion of the personal injury settlement proceeds as nonmarital property and in determining that an airboat he paid for after the parties separated was marital property. Brian also argues that the court erred in inequitably dividing the marital estate. Upon our de novo review of the record, we find that Amy failed to sufficiently demonstrate that any portion of the

settlement proceeds were nonmarital property. Accordingly, we reverse the court's categorization of these proceeds. All of the settlement proceeds should be considered marital property. We also find that there was sufficient evidence presented to demonstrate that Brian's airboat was marital property. As such, we affirm the court's categorization of the airboat as marital property. However, given our reversal of the court's exclusion of any portion of the personal injury settlement proceeds from the marital estate, we remand the matter to the district court to recalculate the value of the estate and to reconsider the division of the assets and debts.

[3,4] Before we address Brian's specific assertions with regard to the court's calculation and division of the marital estate, we briefly recount the legal principles which control our review of this issue. When there is no settlement agreement between the parties on the issue of property division, the trial court is obliged to order an equitable division of the marital estate. Neb. Rev. Stat. § 42-366(8) (Reissue 2008). The equitable division of marital property is a three-step process: The first step is to classify the parties' property as marital or nonmarital, the second step is to value the marital assets and marital liabilities of the parties, and the third step is to calculate and divide the net marital estate between the parties in accordance with statutory principles. See *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). The marital estate includes property accumulated and acquired during the marriage through the joint efforts of the parties. *Nygren v. Nygren*, 14 Neb. App. 1, 704 N.W.2d 257 (2005).

### (a) Settlement Proceeds

In April 2003, when she was 34 years old, Amy suffered a "massive stroke" which left her with permanent disabilities, including limited use of her left hand and left leg. Immediately after the stroke, Amy was hospitalized for 1 week and was then transferred to an inpatient rehabilitation center for 1 month. After her release, she participated in outpatient rehabilitation

for 4 years. Prior to Amy's stroke, she co-owned and operated "Amy's Salon." After the stroke, she is no longer able to work full time as a hairdresser. She does work a couple of hours per week out of a salon in the basement of the marital home and has about 10 regular clients. However, most of these clients are family and close friends, because Amy requires assistance in cutting, coloring, perming, styling, or braiding hair. Amy also requires assistance in performing basic grooming for herself and in completing household chores.

As a result of Amy's stroke, Brian and Amy initiated a lawsuit against Merck & Co., Inc. (Merck), a pharmaceutical company which distributed the anti-inflammatory drug Vioxx. Amy had used Vioxx on almost a daily basis for the 4 years prior to her stroke. Brian, Amy, and Merck ultimately settled their lawsuit after Merck agreed to pay to Brian and Amy approximately $490,000. The settlement was paid in two lump sums and was not specifically broken down so as to allocate any certain amount to Amy's pain and suffering, lost wages, or medical expenses or to Brian's derivative claims. After paying for attorney fees and costs, Brian and Amy received settlement proceeds in the amount of $330,621.40. Almost all of this money had been spent on marital expenses by the time of the dissolution proceedings. In particular, Brian and Amy spent $84,000 of the proceeds paying off the mortgage on the marital home. In addition, they spent approximately $95,000 on making improvements to the home. They also paid off credit card debt, went on family vacations, and invested in a local business referred to as "Elite Fitness."

In the decree of dissolution, the district court recognized that the agreement between Brian, Amy, and Merck "was silent on allocation of payment for Amy's pain, suffering, disfigurement, disability or loss of post-divorce earning capacity or for past wages, medical expenses and other items." However, the court found that a portion of the settlement proceeds should still be set aside as Amy's nonmarital property. The court stated:

The settlement does not come close to compensating Amy for her future pain, suffering, disfigurement, disability. The parties agree that the settlement proceeds were used to pay off the mortgage debt and remodel the kitchen, for a total of $179,604.90. Amy should be given credit for this and should be awarded the marital residence as her sole and separate property free and clear of any interest of . . . Brian, who shall, upon entry of the Decree, execute a quitclaim deed releasing his interest in the property to Amy. When this credit is applied to the value of the property, Amy's net equity is $168,995.91.

Essentially, the court determined that $179,604.90, or 54 percent, of the property settlement proceeds were Amy's nonmarital property.

The court also found that a portion of the settlement proceeds should be set aside as Brian's nonmarital property. The court stated:

The Court finds that Brian opened an account at Five Points Bank with approximately $20,000.00 from Amy's personal injury settlement. The account recently had a value of $4000.00 and has been diminished by Brian to approximately $600.00. He will be awarded that account as credit against his derivative or marital claim to the settlement proceeds. . . .

. . . .

. . . The Court finds that Brian purchased an interest in a business known as "Elite Fitness", investing approximately $37,333.33 from the proceeds of Amy's personal injury settlement. This investment is awarded to Brian as his sole and separate property free and clear of any interest of Amy and shall be applied as a credit against his derivative or marital claim to the settlement proceeds.

It is not clear from the court's statement whether it awarded Brian a total credit of $41,333.33 or $37,933.33, because it is not clear whether the court valued the bank account at $4,000

or at $600. However, for the purpose of our discussion, we will assume that the court awarded Brian a credit of $41,333.33, or 12.5 percent of the personal injury settlement proceeds.

On appeal, Brian challenges the court's categorization of any portion of the personal injury settlement proceeds as nonmarital property. He asserts that Amy failed to sufficiently prove that any of the proceeds were nonmarital property and that, without this proof, the court should have included all of the proceeds in the marital estate. Upon our review, we conclude that Brian's assertion has merit.

[5-8] The Nebraska Supreme Court has previously discussed whether the proceeds from a personal injury award should be categorized as marital or nonmarital property for property distribution purposes in *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999). In that case, the court held:

> [C]ompensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of postdivorce earning capacity should not equitably be included in the marital estate. On the other hand, compensation for past wages, medical expenses, and other items that compensate for the diminution of the marital estate should equitably be included in the marital estate as they properly replace losses of property created by the marital partnership.

*Id.* at 109-10, 602 N.W.2d at 663. The court went on to explain that the burden of proof to show that property is nonmarital remains with the person making the claim. *Id.*

> Thus, in those cases where the party making the claim of nonmarital property fails to prove that all or portions of an injury compensation are for purely personal losses or loss of future earning capacity, the presumption remains that the proceeds from the personal injury or workers' compensation settlement or award are marital property.

*Id.* at 110, 602 N.W.2d at 663.

In this case, the settlement proceeds from Merck were received in two lump-sum payments and without any specific

delineation of whether the proceeds were for Amy's pain and suffering, Amy's lost wages, Amy's medical bills, Brian's derivative claims, or some combination of these figures. Evidence presented at trial revealed that prior to Amy's stroke, she worked full time as a hairdresser at a salon she co-owned. Her annual wages for this employment totaled approximately $43,580. After Amy's stroke, she is essentially unable to work as a hairdresser. She now earns a negligible amount of money working only a few hours a week. Accordingly, it is clear that the marital estate was greatly diminished as a result of Amy's lost wages. In fact, Amy's lost wages from the time of her stroke in 2003 through the time of the parties' separation 10 years later in 2013 totaled more than $100,000 over the entirety of the settlement proceeds. In addition, it is clear that Amy incurred a great deal of medical expenses as a result of her stroke. However, there was no evidence presented to indicate whether or how much the marital estate was diminished for these medical bills or whether the parties' health insurance covered these bills.

While it is clear that Amy's stroke has left her with serious physical impairments, it is also clear that her stroke resulted in a great reduction in the value of the marital estate. The settlement proceeds received from Merck were simply not enough to cover all of the damages incurred by the parties. And, Amy simply failed to prove that any portion of the settlement proceeds were specifically allocated to her purely personal losses. In particular, Amy did not present any evidence which showed that 54 percent of the settlement proceeds were her nonmarital property. Thus, it is not clear how the district court determined that the proceeds should be broken down such that Amy received 54 percent of the proceeds as her nonmarital property; Brian received 12.5 percent of the proceeds as his nonmarital property; and the remaining 33.5 percent of the proceeds stayed in the marital estate. Without specific proof about how the settlement proceeds should be broken down, the presumption remains that all of the proceeds from the

personal injury settlement are marital property. The district court erred in arbitrarily setting aside any portion of the settlement proceeds as nonmarital property. The entirety of the proceeds should be included in the marital estate.

### (b) Airboat

At trial, Amy presented evidence that a few days after the parties' separated in April 2013, Brian purchased an airboat valued at approximately $15,000. Brian paid approximately half of the purchase price of the airboat, $7,750, with a check dated April 9, 2013, which was drawn from his personal checking account. It is not clear whether or how Brian paid the remaining purchase price. Amy testified that she did not know whether Brian had taken out a loan to purchase the airboat. Amy believed this airboat should be considered marital property. Brian, on the other hand, believed the airboat was his nonmarital property. He testified that while he ordered the airboat prior to the parties' separation, he did not pay for any portion of it until a few days after the date of the parties' separation. In addition, he testified that in order to pay for the airboat, he sold some stock he acquired prior to the parties' marriage.

In the decree of dissolution, the district court included the airboat in the marital estate and awarded it to Brian. On appeal, Brian asserts that the district court erred in including the airboat in the marital estate. Specifically, he argues that his testimony that he used the proceeds from the sale of stock purchased prior to the marriage proves definitively that the airboat is his nonmarital property. Upon our review, we affirm the decision of the district court to include the airboat in the marital estate.

The parties presented conflicting evidence about the purchase of the airboat. Amy presented evidence to prove that Brian used money from his personal checking account to pay for it. This account was one of the primary accounts used by the parties during the marriage, and thus, a few days after

the parties' separation, the account arguably still contained primarily marital funds. In addition, there was evidence that Brian actually ordered the airboat during the parties' marriage. Brian disputed Amy's version of how he purchased the airboat. He testified that he used nonmarital funds to buy the airboat. However, he did not provide any specific documentation to support his testimony.

[9] As we have long stated, when evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See, e.g., *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006). Given the conflicting testimony about the purchase of the airboat, and given our deference to the trial court, we cannot say that the district court abused its discretion in including the airboat in the marital estate.

### (c) Property Division

On appeal, Brian also contests the district court's division of the marital estate. He asserts that the court should have awarded both he and Amy 50 percent of their acquired assets and debts. We do not address Brian's assertions with regard to the court's division of the marital estate. Instead, we remand the matter to the district court to recalculate and redivide the marital estate given our conclusion that all of the proceeds from the personal injury settlement should be included in the marital estate.

### 2. Child Support

At trial, the parties' presented conflicting evidence about Brian's current income. Brian testified that he earns $2,500 per month as a property manager for his family's business, Marshall Enterprises. In addition, from his employment with Marshall Enterprises, he receives the use of a company truck, vehicle maintenance for the truck, vehicle insurance, the use of a cellular telephone, and health insurance. Brian's mother,

who is his employer, confirmed Brian's testimony about his monthly salary. Brian also testified that he receives additional snow removal income during the winter months. He estimated that he earns between $10,000 and $12,500 per year for snow removal. In addition, during the discovery process, Brian indicated that his monthly income totaled $3,600 per month. Brian did not specifically contradict this amount at trial.

Amy testified that she believed that Brian earned more than $3,600 per month. To support her assertion, she offered into evidence records from Brian's personal checking account from January through August 2014. These records reveal that during each of the first 8 months of 2014, Brian deposited an average of $7,441 per month into his bank account. Amy indicated that she believed that the court should add $7,400 to Brian's stated earnings of $3,600 to determine his actual monthly income. Essentially, Amy believed that Brian's monthly income totaled at least $11,000 per month. In response to Amy's opinion about his monthly income, Brian testified that he borrowed a great deal of money from his parents during the months of January through August 2014. In addition, he offered a variety of other reasons that the amount of his monthly deposits exceeded $3,600 per month, including that he deposited the rent check from the parties' rental property into the account and then paid the mortgage on that property from the account, that his mother had given him money to put toward the cost of the parties' daughter's activities, and that the bulk of his snow removal income was earned during the first part of 2014.

In the decree of dissolution, the court noted the conflict between the parties' testimony about Brian's monthly income. The court then found:

> Based upon the evidence and the conflicting nature of same . . . the Court has determined to split the difference between the suggested monthly gross incomes for Brian ($11,041.25 − $3600.00 = $7441.00 / 2 = $3720.00. $11,041.00 − $3720.00 = $7321.00) and adjust

that difference downward slightly and Brian's monthly child support shall be recalculated using gross monthly income of $7000.00 . . . .

The court then ordered Brian to pay $935 per month in child support.

On appeal, Brian challenges the district court's calculation of his monthly income and, thus, challenges the amount of monthly child support the court awarded to Amy. Specifically, Brian alleges that the evidence presented at trial does not support the court's determination that his monthly income is $7,000 per month.

Upon our review of the record, we find that Amy's opinion about Brian's monthly income is not reasonable and is not supported by the evidence. Because her opinion about his income is not reasonable, it was not reasonable for the district court to "split the difference" between Amy's and Brian's estimation of income. Amy testified that she believed that the court should calculate Brian's income by adding his estimated monthly salary of $3,600 to his average checking account deposits for the 8 months prior to trial. However, it appears that Amy's proposed calculation of income overstates Brian's income by at least $3,600. Both Brian and Amy testified that Brian's checking account was his primary bank account. Brian testified that he deposits his salary into this account. Amy did not present any evidence to suggest that Brian did not, in fact, deposit his salary into that account. As a result, it appears that if we were to add $3,600 to Brian's monthly checking account deposits, we would be counting this amount twice. Because Amy's proposed calculation of Brian's income substantially overstates his income, we find that the court erred in relying on the calculation in its determination of Brian's actual monthly income. There is simply no evidence in the record to support Amy's assertion that Brian earns more than $11,000 per month.

Given that the court relied, in part, on Amy's erroneous calculation of Brian's monthly income to "split the difference"

and did not otherwise rely upon evidence establishing Brian's various sources of income, we find ourselves in a similar position to the court in *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994). In that case, our Supreme Court noted that it was "difficult to determine just what the trial court found with reference to the [husband's] income, but by combining the findings made and the evidence" from an earlier affidavit, along with the record from the divorce hearing, and the trial court's award, it concluded that child support "can be divined." *Id*. at 105, 511 N.W.2d at 105. The court then considered the husband's wages and in-kind benefits and modified the husband's child support from $400 per month to $427 per month. *Baratta, supra*. Like the *Baratta* court, we will consider various sources of income, as well as in-kind benefits, to determine Brian's monthly income for child support purposes.

Brian testified that he received $2,500 per month from Marshall Enterprises and that he also earned snow removal income. Brian's 2013 Schedule C shows $13,805, or $1,150 per month, as a net profit for "Brian Marshall Remodeling" (snow removal). The district court also pointed out that Brian's 2013 Schedule E showed $22,000 in "passive income"; however, our review of that schedule shows a nonpassive income of $22,000 and a passive loss of $10,966, leaving a total reported nonpassive income of $11,034 for Marshall Enterprises. However, after factoring in real estate rental losses of $1,534, Brian reported $9,500 in total Schedule E income. That is another $792 per month. If we add together Brian's salary ($2,500 per month), snow removal net income ($1,150 per month), and Schedule E income ($792 per month), we arrive at a total of $4,442 per month for Brian before consideration of in-kind benefits he derives from his family business. We consider that next.

[10] In *Baratta, supra*, our Supreme Court imputed an additional $400 to the husband's monthly income because of the rent-free apartment previously occupied by the parties

courtesy of the husband's parents. Another $50 per month was imputed as income for food he received from his parents. It is well established that the provision of in-kind benefits, from an employer or other third party, may be included in a party's income for child support purposes. *Workman v. Workman*, 262 Neb. 373, 632 N.W.2d 286 (2001). See, also, *State on behalf of Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998) (military housing benefit and subsistence allowance included as income).

In the present case, the district court found that Brian had been living rent free in one of his parent's rental properties since February 2013 (which we note was just shy of 2 years by the time the decree was entered in December 2014). The court found that the monthly rental was $1,000, but that Brian had not paid any rent to his parents. As in *Baratta, supra*, we conclude this amounts to an in-kind benefit that may be included in Brian's income for child support purposes. Adding this amount to the $4,442 in other income increases Brian's monthly income to $5,442. However, Brian's in-kind benefits went beyond free housing.

At trial, both Brian and his mother testified that Marshall Enterprises pays for his cellular telephone. And, while neither Brian nor his mother attributed a specific dollar amount to this benefit, the affidavit of financial condition submitted by Brian indicates that his monthly cellular telephone bill is $271.20. In addition, evidence presented at trial revealed that Brian's health insurance costs are also paid for. According to Brian's 2013 tax return, these costs total $1,817 per year, or about $151 per month. And, although there was conflicting evidence about whether these costs are paid for by Marshall Enterprises as an in-kind benefit for his employment or whether they are given to Brian as a gift from his parents, we find that there is sufficient evidence to warrant the inclusion of Brian's health insurance costs in the calculation of his income. Adding the amounts that Brian receives for his monthly cellular telephone bill and his health insurance costs

to the $5,442 in other income increases Brian's monthly income to $5,864.20.

We note that there is also some indication in the record that Brian has received a truck and the insurance and maintenance for that truck as an in-kind benefit for his employment with Marshall Enterprises. Again, though, there is no evidence of a specific dollar amount for this benefit. In fact, there is evidence that this benefit has no real personal value for Brian, because he testified that the truck is owned by Marshall Enterprises and that he only uses the truck for his work with Marshall Enterprises. Brian testified that he owns another truck, which is for his personal use. Brian's personal truck was apparently paid off shortly before the trial, as was Amy's personal vehicle. Despite the evidence that Brian does not own, nor did he pay for, the company truck and that both he and Amy's personal vehicles have been paid for in full, Brian lists a car payment of $993.13 on his list of monthly expenditures. It is not at all clear which vehicles this payment encompasses, but given Brian's testimony about the company truck, we do not find that we can infer that the car payment of $993.13 reported on Brian's monthly expenditures is in any way associated with his use of the company truck. And, given that there is no other evidence about any value that Brian receives from the use of the company truck, we do not include in our income calculations any amount for this in-kind benefit.

Based upon our review of all of the evidence concerning the sources of Brian's income, including his salary from Marshall Enterprises, his snow removal income, and the in-kind benefits he receives from his employment, we conclude that Brian's monthly income totals $5,864.20, and we round this amount to $6,000. Our calculation of Brian's monthly income is $1,000 less than the district court's calculation of $7,000, which we previously found to be not supported by the evidence. Given this significant alteration to Brian's monthly income, we remand the matter to the district court for a new

calculation of Brian's child support obligation, using $6,000 as his monthly income.

### 3. Admission of Exhibit 81

At trial, Amy offered into evidence exhibit 81, which contained various documents related to the parties' settlement agreement with Merck. These documents included the affidavit of Amy concerning her use of Vioxx and her stroke; affidavits from two doctors concerning Amy's use of Vioxx; letters from Brian and Amy's lawyer concerning Amy's medical bills, lost wages, and a doctor's opinion about the cause of Amy's stroke; a letter from Amy's rehabilitation physician about her disabilities; a copy of the "Release of All Claims" signed by Brian and Amy; and copies of the settlement checks issued to Brian and Amy from Merck. Brian objected on foundational and hearsay grounds to all of the documents in exhibit 81 except the copy of the "Release of All Claims" and the copies of the settlement checks. The district court overruled Brian's objections and received into evidence exhibit 81 in its entirety.

On appeal, Brian challenges the district court's decision to admit into evidence exhibit 81. Specifically, he alleges that exhibit 81 contains hearsay which purports to reveal the cause of Amy's stroke, Amy's disabilities as a result of the stroke, and the amount of Amy's monetary damages, and that such hearsay is inadmissible. We find Brian's assertions regarding the admissibility of exhibit 81 to be without merit.

[11] Assuming without deciding that exhibit 81 contains inadmissible hearsay with regard to the cause of Amy's stroke, Amy's disabilities as a result of the stroke, and Amy's monetary damages, this evidence is cumulative to other, unobjected to evidence presented at trial and, as a result, amounts to harmless error. Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007).

At trial, Amy repeatedly testified that her doctors had attributed her stroke to her daily use of Vioxx for the previous 4 years. Amy also testified extensively concerning her physical disabilities after her stroke, including her limited use of her left hand and left leg and various activities and chores she could not engage in because of these limitations. In addition, Amy's mother testified about Amy's physical limitations after the stroke. This evidence essentially mirrors the information presented in exhibit 81 about the cause of Amy's stroke and about her resulting disabilities. Brian did not object to any of this testimony at trial. However, on appeal, he does assert that Amy's testimony about the cause of her stroke lacked foundation and should have been excluded. Brian has not properly preserved his objection to Amy's testimony for appeal. See *Furstenfeld v. Pepin*, 23 Neb. App. 155, 869 N.W.2d 353 (2015). As has long been the case, appellate courts do not generally consider arguments and theories raised for the first time on appeal. *Id*.

During Brian's cross-examination of Amy, his counsel asked her about the amount of medical expenses and lost wages she incurred as a result of her stroke. Counsel relied on the information contained in exhibit 81 to ask Amy these questions, and Amy independently confirmed that information. Accordingly, the information contained in exhibit 81 about Amy's monetary damages is cumulative to Amy's own testimony about these figures, which testimony was prompted by Brian's questions of her. Accordingly, Brian's assertion regarding the admissibility of this information and of exhibit 81 as a whole is without merit.

### 4. Alimony

In the decree, the district court ordered Brian to pay Amy alimony in the amount of $2,000 per month for a period of 21 years. On appeal, Brian argues that the alimony award is an abuse of discretion. Given our conclusion that it is necessary to remand the matter to the district court to recalculate

and divide the marital estate and to recalculate Brian's current income, we also reverse the district court's decision concerning alimony.

[12,13] In awarding alimony, a court should consider, in addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2008), the income and earning capacity of each party as well as the general equities of each situation. *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004). Section 42-365 includes the following criteria:

> [T]he circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

Disparity in income or potential income may partially justify an award of alimony. *Hosack v. Hosack*, 267 Neb. 934, 678 N.W.2d 746 (2004).

Clearly, an award of alimony is intricately tied to the incomes and other relevant financial circumstances of each party. See § 42-365. See, also, *Marcovitz, supra*. In our analysis above, we determined that the district court erred in calculating both the marital estate and Brian's income and we remanded the matter with directions to redistribute the marital estate and to recalculate Brian's child support obligation. When the district court performs these recalculations, the court's determination concerning an appropriate award of alimony will necessarily be affected.

Thus, we also reverse the district court's award of alimony. In reversing this award, however, we specifically do not find that the district court abused its discretion in entering the award. Rather, we simply direct the district court to reconsider the issue of alimony in light of the changed circumstances

resulting from the recalculation of both the marital estate and Brian's current income.

## VI. CONCLUSION

Upon our de novo review of the record, we find that the district court erred in failing to include all of the proceeds from the personal injury settlement in the marital estate and in calculating Brian's current income. As a result of these errors, we remand the matter to the district court to recalculate the value of the parties' marital estate, redistribute the assets and debts between the parties, and recalculate Brian's child support obligation. In addition, we reverse the district court's determination concerning Amy's alimony award, because the court should reconsider this award in light of any changes to the marital estate and to Brian's child support obligation. We affirm the remainder of the district court's decision.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

BISHOP, Judge, concurring in part, and in part dissenting.

I dissent from that part of the majority's opinion which reverses the district court's classification of the personal injury settlement proceeds into nonmarital and marital portions. I also dissent from the majority's reversal of the alimony award.

Regarding the settlement proceeds, the majority concludes that "Amy failed to sufficiently demonstrate that any portion of the settlement proceeds were nonmarital property" and that "[a]ll of the settlement proceeds should be considered marital property." The majority determines that the settlement proceeds ($330,621.40) were apportioned 54 percent to Amy as nonmarital and 12.5 percent to Brian as nonmarital, with the remaining 33.5 percent attributed to the marital estate. The majority then states, "Without specific proof about how the settlement proceeds should be broken down, the presumption remains that all of the proceeds from the personal injury settlement are marital property" and that the "district court

erred in arbitrarily setting aside any portion of the settlement proceeds as nonmarital property."

The majority reverses this portion of the district court's decision and remands the matter for a recalculation of the value of the marital estate and a redivision of the marital estate given its conclusion that all of the proceeds from the personal injury settlement should be included in the marital estate. I conclude that the record supports the district court's treatment of the settlement proceeds, and given our abuse of discretion standard of review, I would affirm the district court's decision on this issue.

The majority acknowledges that our Supreme Court has held that "[c]ompensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of postdivorce earning capacity should not equitably be included in the marital estate," but that "compensation for past wages [and] medical expenses . . . should equitably be included in the marital estate as they properly replace losses of property created by the marital partnership." *Parde v. Parde*, 258 Neb. 101, 109, 110, 602 N.W.2d 657, 663 (1999). The majority concludes, however, that "[w]ithout specific proof about how the settlement proceeds should be broken down, the presumption remains that all of the proceeds from the personal injury settlement are marital property."

It is not clear what kind of "specific proof" the majority contemplates in a situation such as this, where a personal injury settlement agreement is silent as to how the settlement amount was calculated. When the settlement agreement is silent in this regard, but there obviously has been both (1) a personal loss, such as pain, suffering, disfigurement, disability, and loss of postdivorce earning capacity (deemed nonmarital), and (2) a marital economic loss, such as wages lost during the marriage and medical expenses (deemed marital), the apportionment of nonmarital and marital amounts must be left to the discretion of the trial court based upon the evidence presented. And while determining wages lost as a result of the

injury both during the marriage and postdivorce, along with determining out-of-pocket medical expenses, are amenable to mathematical calculation, there is no formula for calculating a monetary value for the losses personal to the injured party. There is, however, in the present case, evidence of how Amy's injury has permanently impacted her in many personal ways. And while we can approximate her potential future lost wages (discussed later), there is no way to provide "specific proof" as to how her personal losses (pain, suffering, disfigurement, and disability) equate with a monetary value when the settlement agreement is silent on the matter. But that should not mean we must ignore these personal losses completely; to do so is inherently unjust.

In fact, the *Parde* court reminds us:

In equity, there is rarely one tidy answer that fits every size and type of problem that courts are called upon to resolve. It is precisely for this reason that a principled *approach* to this issue should be consistent with the basic policy rule that the marital estate should include only property created by the marital partnership.

258 Neb. at 108, 602 N.W.2d at 662. The *Parde* court went on to say, "Compensation for purely personal losses is not in any sense a product of marital efforts." 258 Neb. at 109, 602 N.W.2d at 663. By requiring the district court to treat the settlement proceeds entirely as marital, the majority ignores the significant personal losses suffered by Amy alone, despite her testimony and the testimony of others regarding the same. Contrary to *Parde*, the majority compels the inclusion of Amy's "personal losses" into the marital estate which are "not in any sense a product of marital efforts." 258 Neb. at 109, 602 N.W.2d at 663.

When discussing the division of settlement proceeds in its 34-page decree, the district court quoted from *Parde, supra*. That quote bears repeating here:

"'Nothing is more personal than the entirely subjective sensations of agonizing pain, mental anguish,

embarrassment because of scarring or disfigurement, and outrage attending severe bodily injury. Mental injury, as well, has many of these characteristics. Equally personal are the effects of even mild or moderately severe injury. None of these, including the frustrations of diminution or loss of normal body functions or movements, can be sensed, or need they be borne, by anyone but the injured spouse. Why, then, should the law, seeking to be equitable, coin these factors into money to even partially benefit the uninjured and estranged spouse? . . . The only damages truly shared are those discussed earlier, the diminution of the marital estate by loss of past wages or expenditure of money for medical expenses. Any other apportionment is unfair distribution.'"

*Parde v. Parde*, 258 Neb. 101, 109, 602 N.W.2d 657, 662-63 (1999) (quoting Brett R. Turner, Equitable Distribution of Property § 6.18 (2d ed. 1994)). It is true that *Parde* also states that "in those cases where the party making the claim of non-marital property fails to prove that all or portions of an injury compensation are for purely personal losses or loss of future earning capacity, the presumption remains that the proceeds . . . are marital property." 258 Neb. at 110, 602 N.W.2d at 663. However, Amy did not fail to prove that some portion of the compensation for her injury represented purely personal losses or loss of future earning capacity. As noted by the district court, the "settlement does not come close to compensating Amy for her future pain, suffering, disfigurement, disability." After setting forth the language from *Parde, supra*, block-quoted above, the district court stated:

As was the case in *Parde*, the release that Amy and Brian signed was silent on allocation of payment for Amy's pain, suffering, disfigurement, disability or loss of post-divorce earning capacity or for past wages, medi-cal expenses and other items that compensate for the period in issue of the marital estate. Notwithstanding, the Court, as the trier of fact and judge of the credibility of

the witnesses, had an opportunity, over two days of trial, to not only see and hear Amy testify but could see how profoundly and permanently she has been affected and disabled by the massive stroke she sustained at such an early age, after having worked in her salon the entire day and then went home and prepared a birthday dinner for Brian, who is now seeking to receive credit for half of the personal injury settlement of $330,621.14. The Court did not need the settlement documents, Ex. 81 (sealed), to see and appreciate the serious nature of Amy's permanent injuries.

Additionally, the district court specifically set forth, in part, the following factual determinations in its decree: Amy began having lower back problems in 1997 and her father-in-law (an oral surgeon) recommended she see a neurosurgeon who had an office across from her father-in-law's office; samples of Vioxx were given to Amy through her father-in-law for years; on April 30, 2003, Amy suffered a massive stroke as a result of an occluded carotid artery; an expert determined Amy's use of Vioxx proximately contributed to her stroke; Amy and Brian made a claim against the pharmaceutical company (Merck); despite rehabilitation efforts, Amy remains with significant left-sided paralysis and has no significant functional use of her left upper extremity; the stroke eliminated the functional use of her left hand, so Amy was unable to sustain reasonable work as a hairstylist and had to give up her career and sell her salon; feeding is difficult because she is unable to cut meat or prepare foods that require two hands; dressing must be performed with one hand, so Amy must select clothes without buttons or zippers; toileting and bathing tasks must be performed with one hand and with adaptive equipment; she is unable to completely groom herself; she has "residuals of a neurogenic bladder" so she has urinary urgency and must get to a bathroom more frequently; ambulation is clumsy and adaptive—she "swings her left lower extremity forward in a circumferential pattern

and has difficulty maintaining static stance on just her left lower extremity"; she falls monthly and has musculoskeletal bruises, sprains, and strains as a result of her falls; she requires antiplatelet medication and other prescription medications; she can drive but only by using her right hand as she has no use of her left wrist and hand and has limited range of motion with her left arm; she cannot straighten her left arm; she used her mouth to close a zipper on her purse at trial; her left leg has a brace on it; and "[h]er daughter helps her with everything."

Given these factual determinations made by the district court, as supported by the record, there was no failure of proof on Amy's part in establishing how the injury has impacted her personally and no question that a substantial portion of the settlement should be allocated for her separate, nonmarital benefit. Awarding Amy slightly over one-half the proceeds for her nonmarital personal losses is further supported by consideration of her marital and postdivorce lost wages, as discussed next.

Amy's preinjury annual wages were approximately $43,580, and she was 34 years old at the time of her stroke in April 2003. The majority states:

> [I]t is clear that the marital estate was greatly diminished as a result of Amy's lost wages. In fact, Amy's lost wages from the time of her stroke in 2003 through the time of the parties' separation 10 years later in 2013 totaled more than $100,000 over the entirety of the settlement proceeds.

And although the majority acknowledges that Amy's stroke "left her with serious physical impairments," it concludes that "her stroke resulted in a great reduction in the value of the marital estate" and that the proceeds "were simply not enough to cover all of the damages incurred by the parties." While this may be true, it is also true that the proceeds were insufficient to cover the totality of Amy's losses, including her future lost wages.

Amy's future lost wages is well demonstrated by a demand letter dated September 1, 2009 (contained in exhibit 81), which reflects future lost wages of "$1,133,080.00 (26 years × $43,580.00)." In September 2009, Amy would have been 40 years old, and but for the injury, it would have been reasonable to anticipate she could have worked for another 26 years (until 2035). The total number of years from the time of injury (April 2003) until 2035 equals 32 working years affected by Amy's injury. These 32 working years of a reduced earning capacity not only "greatly diminished" the marital estate, as noted by the majority, but also diminished on a larger scale Amy's postdivorce future earnings. Since Amy filed for divorce in February 2013, about 10 years after the injury, of her 32 working years of diminished wages, the marital portion accounts for only one-third of that time (10 years), whereas, the postdivorce, nonmarital portion accounts for the other two-thirds (22 years). So even if we set aside the obvious personal losses to Amy previously discussed, her postdivorce wage-earning losses alone support the district court's apportionment of 54 percent of the settlement proceeds to Amy as her nonmarital share.

Finally, out-of-pocket medical expenses incurred during the marriage as a result of Amy's stroke could have been classified as marital property factored into the settlement proceeds. I agree with the majority that "there was no evidence presented to indicate whether or how much the marital estate was diminished for these medical bills or whether the parties' health insurance covered these bills." Accordingly, since out-of-pocket medical expenses incurred during the marriage were not raised by either party, the trial court was left with the task of apportioning the settlement proceeds between Amy's personal losses (such as pain, suffering, disfigurement, disability, and loss of postdivorce earning capacity) (deemed nonmarital) and wages lost during the marriage (deemed marital). Finding no abuse of discretion by the district court in these determinations, I would affirm all aspects of the district court's

decision pertaining to the classification, valuation, and division of property.

I also dissent with regard to the majority's reversal of the alimony award. The majority reversed the alimony award because of its remand of the matter for a recalculation of the marital estate, along with a recalculation of Brian's income for child support purposes. The majority states, "When the district court performs these recalculations, the court's determination concerning an appropriate award of alimony will necessarily be affected." Since I would affirm the district court's property award, this is not a factor that would influence the court's alimony decision. And although I agree that Brian's income was not properly calculated and his child support obligation should be remanded for recalculation, I do not agree that any adjustment made to his income must necessarily impact the court's determination of alimony.

The district court determined that Brian's monthly income was $7,000; the majority determined, and I agree, that the record supported an income attributable to Brian of approximately $6,000. While this $1,000 per month difference in income supports a recalculation of Brian's child support obligation, I do not agree that it must necessarily require a change to the $2,000 per month in alimony awarded to Amy. With an income of $6,000 per month, along with a reduced child support award on remand, an alimony award of $2,000 per month based upon the circumstances of this case is not an abuse of discretion. This is particularly so since the $935 per month child support obligation only became effective as of January 1, 2015, and would have terminated 8 months later when the minor child reached her age of majority in August 2015.

In all remaining aspects of the majority's opinion, I concur.